Christopher B. Hadley (14055)
Nathan D. Thomas (11965)
C. Michael Judd (14692)
**JONES WALDO HOLBROOK & McDONOUGH PC**
170 South Main Street, Suite 1500
Salt Lake City, Utah 84101
Tel.: (801) 521-3200
chadley@joneswaldo.com
nthomas@joneswaldo.com
mjudd@joneswaldo.com

*Attorneys for Plaintiff Big Squid Inc.*

**IN THE THIRD DISTRICT COURT OF SALT LAKE COUNTY**
**STATE OF UTAH**

| | |
|---|---|
| **BIG SQUID INC.**, a Delaware corporation, <br> Plaintiff, <br> vs. <br> **DOMO, INC.**, a Utah corporation, <br> Defendant. | **COMPLAINT** <br><br> Case No.: 190900914 <br> Hon. Richard Mrazik |

Plaintiff Big Squid Inc. ("Big Squid") brings this Complaint against Defendant Domo, Inc. ("Domo").  In support of its Complaint, Big Squid alleges as follows:

**PRELIMINARY STATEMENT**

1.      Big Squid and Domo have worked together productively for more than three years.  In 2016, Big Squid became one of Domo's first partners in its App Publisher Program, the digital toolbox Domo offers to its subscribers.  And in 2018, Domo named Big Squid its "Innovative Partner of the Year."

2.      Domo relies heavily on Big Squid and others to implement and expand its services. When Domo sells its services to subscribers, for example, Big Squid may be asked to install or configure those services for the subscriber.  In other cases, Big Squid fosters customer relationships and secures sales for Domo.  Domo even uses Big Squid's apps to make money:  Big Squid's

apps are listed on Domo's Appstore, and when those apps are purchased, the buyer's money goes first to Domo, who is allowed to extract a fee before passing the payment on to Big Squid.

3.      In all of these cases, money flows first to Domo before passing to Big Squid.  But Domo isn't allowed to cling to these funds indefinitely—its contracts with Big Squid require it to make payments to Big Squid within a certain amount of days, typically 15 to 45 days.

4.      Beginning in May 2018, Domo simply stopped paying Big Squid.  It stopped paying invoices for services Big Squid had already provided, stopped paying Big Squid for sales it secured, and even stopped transmitting to Big Squid the money paid through the Domo Appstore for Big Squid's own apps.

5.      By mid-September 2018, nearly $900,000 in payments Domo owed to Big Squid were past due.  In some cases, those payments are months overdue.  Big Squid has asked Domo, again and again, to pay.  Domo won't.  Big Squid has therefore brought this action to recover the amounts that Domo refuses to pay.

6.      At the same time Domo decided to stop payments to Big Squid, it intensified efforts to force Big Squid from the market, both by misappropriating Big Squid's intellectual property to develop, market, promote, and distribute competing offerings, and by unlawfully interfering with Big Squid's business relationships.

7.      Domo's goal is clear:  by cutting off payments that are undisputedly long overdue, while at the same time misappropriating Big Squid's intellectual property and attacking its business relationships, Domo is attempting to drive a rival out of the marketplace.  Domo's actions aren't lawful competition—they are blatant violations of the parties' contracts.

**PARTIES**

8.     Plaintiff Big Squid Inc. is a Delaware corporation with its principal place of business in Salt Lake City, Utah.  Plaintiff was formerly known as Cephalopod Media, LLC.

9.     Upon information and belief, Defendant Domo, Inc. is a Utah corporation with its principal place of business in American Fork, Utah.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over this matter in accordance with Utah Code § 78A-5-102.

11.     Venue is proper in this Court in accordance with Utah Code § 78B-3-304(2).

12.     This Court has personal jurisdiction over Domo because Domo is a resident of this state and judicial district.  This Court also has personal jurisdiction over Domo because, on information and belief, Domo is engaged in regular and substantial business in the District of Utah.

13.     Big Squid's damages exceed the Tier III level of damages prescribed by Rule 26(c)(3) of the Utah Rules of Civil Procedure, and this case therefore qualifies for a Tier III discovery track.

**FACTS**

*Domo and Big Squid*

14.     Domo purports to be a "business intelligence" company offering its business clients the ability to "put [their own] data to work" and to "take action with data."  Among Domo's offerings are "native apps" that allow executives to "run [their] business from [their] phone."

15.     Big Squid offers its customers access to a "machine learning platform" that "unlock[s] the hidden value of a company's data."

*The April 2015 Master Service Provider Agreement*

16.     On April 10, 2015, Domo and Big Squid (then operating as Cephalopod Media, LLC) executed a Master Service Provider Agreement (MSPA) establishing "terms and conditions for certain services to be performed by [Big Squid]," including "subcontracting services for Domo

3

Subscribers."  The MSPA recognized that the additional terms and conditions for Big Squid-pro-vided services may also be "further described . . . in Statements of Work" between the two parties.

17.    The MSPA anticipated a specific arrangement:  Domo would provide a client who had already agreed to subscribe to a Domo software package or service.  Big Squid would then be asked to "install[], configur[e], and/or implement[]" the Domo software or service for the client. Each of these Big Squid engagements would be documented using a written Statement of Work (SOW).

18.    The MSPA also provides invoicing and payment terms.  Once the work described in an SOW is "complete[]," Big Squid "shall submit [an] invoice[]" to Domo. For all work performed in accordance with the MSPA, Domo is required to make full payment to Big Squid within 45 days of receiving an "accurate invoice."

19.    Even if Domo disputes an invoice item or objects to the quality of the work performed, the MSPA does not permit Domo to withhold the payment in full.  Rather, the MSPA directs that Domo "deduct the disputed amount from the total," then "make payment of the undisputed amount."  And even this "deduction" approach requires that Domo "promptly document[]" to Big Squid both the amount deducted and the reason for the deduction.

20.    The MSPA also contains a provision protecting Big Squid's Confidential Information from misuse by Domo, and vice versa.  Section 6.3 of the MSPA, titled "Restrictions on Disclo-sure, Work for Competitors, and Non-solicitation," contains three paragraphs.  Under the first, the parties agree "not to make each other's Confidential Information available in any form to any third party . . . or to use each other's Confidential Information for any purpose other than the perfor-mance of [the MSPA]."

21.    The second paragraph of Section 6.3 provides:

During the term of [the MSPA] and any SOW, and for one year thereafter, [Big Squid] will not subcontract or provide services on behalf of any of Domo's direct competitors. Domo will provide a list of its direct competitors upon [Big Squid's] request. [Big

Squid] further agrees, to the extent allowable by applicable law, to execute comparable non-compete agreements with all personnel assigned to perform work under [the MSPA] and/or related SOW's.

Big Squid refers to this provision below as "the MSPA Non-Compete Provision"

22.    The third paragraph of Section 6.3 is a non-solicitation provision, providing that during the term of the MSPA and any SOW, and for one year afterward, Big Squid will not "solicit, hire, attempt to solicit or hire, or participate in any attempt to solicit or hire" Domo employees or contractors, aside from "general, non-targeted advertisements."

23.    Section 7 of the MSPA governs the parties intellectual-property rights for materials related to MSPA services provided by Big Squid.  Put simply, Domo retains the rights to its own "Domo Service" and related materials and obtains the rights to "Deliverables"—materials "originated, prepared, or provided" to Domo or a subscriber by Big Squid "in the course of performing Professional Services under [the MSPA]."  But to the extent these Deliverables "incorporate any of [Big Squid's] Pre-Existing Materials"—materials that Big Squid has previously developed, patented, or copyrighted and that were not developed in the course of performing services under the MSPA—Big Squid retains all right, title, and interest to those materials, subject only to a non-exclusive license permitting Domo or its subscriber to "use, copy, sublicense, and distribute" the materials incorporated into the Deliverables and to "prepare derivative works therefrom."

24.    Section 4.2 of the MSPA, governing Termination for Material Breach, explains, "Failure of Domo to make payments when due hereunder shall be a material breach of this Agreement and SOW under which such payment obligation accrued…."

### The January 2016 Domo App Publisher Program Agreement

25.    On January 31, 2016, Domo and Big Squid (again through Cephalopod Media LLC) entered into a Domo App Publisher Program Agreement (DAPPA).  In conjunction with the DAPPA, Big Squid has developed applications (apps) for listing on the Domo Appstore, where those Big Squid apps can be purchased by Domo subscribers.  Among these Big Squid apps is Big

Squid's "Predictive Toolkit," which enables businesses to construct predictive models and make better-informed decisions.

26.    Again, the payment terms under the DAPPA are simple.  Big Squid sets the price for its apps.  The Domo subscriber makes payment for the Big Squid app to Domo.  Domo extracts "applicable taxes, App fees owed to Domo, refunds . . . , and other appropriate fees," if any, then transmits the remainder of the fee to Big Squid.  The DAPPA requires that Domo make that payment to Big Squid "as detailed in the [Domo] Program Guide, in accordance with Domo's then-current payment policies." And in its Program Guide, Domo promises that proceeds on app sales will be paid by the fifteenth day of the month following Domo's receipt of full payment from an app subscriber has paid Domo in full for the app.

27.    Like the MSPA, the DAPPA addresses intellectual-property ownership.  As an App Publisher under the DAPPA, Big Squid grants Domo only a non-exclusive license to market its apps and to "access, use, sell, copy, host, reproduce, display, publicly perform, distribute, [and] modify" its apps.  But "nothing in [the] DAPPA transfers or assigns to Domo any of [Big Squid's] intellectual property rights in the App or in [Big Squid's] other technology, marks, products, or services."

28.    The DAPPA contains confidentiality provisions similar to those contained in the MSPA, providing reciprocal protections against disclosure for both Big Squid's Confidential Information and Domo's.  The DAPPA contains no non-competition or non-solicitation provisions.

29.    In order to participate in Domo's Appstore and pursuant to the Domo App Publisher Program Guide (Program Guide) Domo required Big Squid to provide the complete app to Domo for evaluation purposes:

**DOMO APP SUBMISSION, EVALUATION & DISTRIBUTION OF DOMO APPS**
- **After App Publisher submits a Domo App for publication to the Domo Appstore, Domo will evaluate all submitted Domo Apps for quality, security, and other factors.  Approval of any App is subject to Domo's sole discretion.**

Through this requirement, Domo obtained access to Big Squid's Predictive Toolkit source code and proprietary technology, all subject to the confidentiality and intellectual property ownership provisions in the DAPPA.

30.    Most critically, the DAPPA, along with the parties' December 16, 2016 DAPPA Amendment, provide specific protection for *Big Squid's* Intellectual Property and Confidential Information.  Section 2 of that Amendment, for example, provides that Domo is not entitled to "develop, acquire, license, market, promote, or distribute products, software, or technologies that perform the same or similar functions as, or otherwise compete with" Big Squid's "Apps, products, software, or technologies" if, in doing so, Domo "utilize[s], incorporate[s] or rel[ies] upon [Big Squid's] Intellectual Property or Confidential Information."  This provision is central to this action, as in addition to failing to make the payments required by its agreements with Big Squid, Domo has also utilized, incorporated, and relied upon Big Squid's intellectual property and/or confidential information in developing Mr. Roboto, an "Artificial Intelligence Platform" that "integrates machine learning" into "the business cloud"—just as Big Squid's "Predictive Toolkit" does.

### *The July 2016 Master Resale and Referral Agreement*

31.    On July 27, 2016, Domo and Big Squid (again through Cephalopod Media LLC) entered into a Master Resale and Referral Agreement (MRRA), under which Big Squid was authorized to "resell the Domo Service" and related offerings to potential subscribers and to provide services directly to subscribers "as a Domo subcontractor."

32.    The MRRA contains its own payment terms.  When Big Squid sells Domo services to "Referral Subscribers," Big Squid is entitled to "Referral Fees."  When Big Squid provides professional services to a subscriber under the MRRA, Big Squid is entitled to fees described in the "applicable Statement of Work."  And when Big Squid sells Domo services to "Resale Subscribers," Big Squid is entitled to fees described either the Domo Program Guide or in "a Reseller

7

Service Order."  In any of those cases, all payments from Domo to Big Squid are "due net 30 days from the date of the applicable invoice."

33.    The MRRA provides that the Domo Service and the associated materials and intellec-tual-property rights remain the property of Domo and that Domo obtains either the rights-holder or non-exclusive licensee to deliverables provided by Big Squid as part of its provision of services under the MRRA.

34.    The MRRA contains confidentiality provisions similar to those contained in the MSPA and the DAPPA, providing reciprocal protections against disclosure for both Big Squid's Confi-dential Information and Domo's.  Like the DAPPA, the MRRA contains no non-competition or non-solicitation provisions.

35.    Importantly, this third and final agreement between the parties states:  "This Agree-ment, including the Program Guide and any exhibits thereto, constitute the complete and exclusive understanding and agreement between the parties regarding its subject matter and supersedes all prior contemporaneous agreements or understandings, written or oral, relating to its subject mat-ter."  *See* Section 14.13.  Further, the preamble of the MRRA defines the subject matter of the Agreement:  "This Agreement sets forth the terms and conditions under which Company [Bid Squid] is authorized to resell the Domo Service and related Domo Professional Services and of-ferings to Subscribers, refer potential Subscribers to Domo, or provide Professional Services to Domo Subscribers as a Domo Subcontractor, subject to the Company's specific program type and tier."

### *Domo's Mimicking of Big Squid's IP*

36.    Through its relationship with Big Squid, Domo gained access to Big Squid's intellec-tual property and confidential information.  Among this information was Big Squid knowledge and capabilities related to machine learning.  At Big Squid, this knowledge and these capabilities

were part of its "Predictive Toolkit," to which Domo had access by virtue of its contractual and business relationship with Big Squid.

37.     As explained above, the DAPPA prohibits Domo from "utiliz[ing], incorporat[ing], or rely[ing] upon [Big Squid's] Intellectual Property or Confidential Information" in "develop[ing], acquir[ing], licens[ing], market[ing], promot[ing], or distribut[ing] products, software, or technologies that perform the same or similar functions as, or otherwise compete with" Big Squid's "Apps, products, software, or technologies."  Despite this express contractual prohibition, Domo did exactly that:  it utilized, incorporated, and/or relied upon Big Squid's intellectual property and confidential information—specifically, upon Big Squid's machine-learning knowledge and capabilities, which were part of Big Squid's "Predictive Toolkit,"—to develop, market, promote, and distribute Mr. Roboto, an "artificial intelligence platform" that purports to "integrate machine learning and other AI technologies into the business cloud."

38.     As the contracts between the parties illustrate, Domo's access to Big Squid's knowledge, capabilities, and information began in early 2015 and became more expansive in late 2015 and in 2016.  Domo announced Mr. Roboto in March 2017.

39.     In March 2018, Domo held an event called Domopalooza 2018—a networking and entertainment event with thousands of attendees, featuring "industry and product experts."  In the months leading up to Domopalooza 2018, Domo operationalized an overt strategy to copy Big Squid's technology and IP, which had they had gained access to through the Domo App Store and co-selling.

40.     Domo spared no expense in attempting to replicate the form and function of the Big Squid Predictive Toolkit app with their own app called Domo Predictive Analytics.

41.     Domo began messaging to its Sales and Client Services teams that when customers or prospects inquire about Predictive Analytics, Machine Learning, Forecasting, or any other broadly related inquiries, that those Domo reps are to promote the Domo Predictive Analytics app.

42.   Domo then took the extraordinary step of publicly highlighting their app at the Domo-palooza 2018 conference in the mainstage keynote address to 3,000 of Domo's and Big Squid joint customers and prospects.

*Domo's Interference with Big Squid's Business Relationships*

43.   One of Big Squid's product offerings is called Kraken—a software platform that ena-bles automated machine learning, designed to help companies better understand their own data and use computer algorithms to help predict future results.  As part of its co-selling relationship with Domo, Big Squid would jointly promote Kraken along with Domo services and software.

44.   Six months after Big Squid began co-selling Kraken with Domo services and software, Domo began efforts to copy Kraken and exclude Big Squid from relationships with co-sold cus-tomers.

45.   Text messages sent by Domo employees, for example, show Domo attempting to ex-clude Big Squid from a co-selling opportunity with Walmart.  Text messages also show that, in that instance, Domo took the added steps of conspiring internally to ensure they had adequately replicated Big Squid's technology before kicking Big Squid out of the deal.  Domo took the further step of violating its own customer subscriber agreement with Walmart by entering the Domo in-stance and deleting Big Squid's access.

46.   Walmart later notified Domo they wanted to continue working with Big Squid, and further Walmart restored access to Big Squid.  After it became clear Domo could not deliver an adequate predictive analytics solution to Walmart, Domo leadership instructed their Sales team to spy on Big Squid, copy what we are doing and report back to Domo leadership and Engineering teams so they could continue to replicate our technology.  This plan, again, is reflected in text exchanges involving Domo employees.

47.   Domo took similar action with respect to Sears, another joint customer.  On a call involving representatives from Domo, Big Squid, and Sears, Domo employees attempted to record

Big Squid's presentation with the expressed intent of copying Big Squid's intellectual property and product functionality, along with its sales approach.

48.    When Big Squid asked that Domo to stop its efforts to record the presentation for confidentiality reasons, Domo refused.  Sears, as the customer, was forced to step in and demand that Domo stop recording, at which point there is reasonable evidence that Domo utilized a separate clandestine method of recording the call.

49.    Domo has also disparaged Big Squid to third-parties, including, but not limited to actual and potential customers or partners, and prospective employment candidates.  For example, Domo told other Big Squid partners (e.g., Red Door Interactive) that Big Squid breached the Domo agreements.  The result of Domo's conduct and assertion of leverage through the disclosure of confidential information was that Red Door Interactive terminated a sponsorship opportunity for Big Squid.  Big Squid also recently lost a large potential customer, after the customer had engaged Big Squid in a product and services pilot program, because Domo interfered with the sales process, had the pilot with Big Squid terminated, and instead sold the potential customer on Domo's own predictive analysis solution.

50.    Upon information and belief, chief executives of Domo told potential Big Squid candidates to avoid progressing with a job opportunity with Big Squid because of alleged business and contractual issues, causing the candidates to decline offers or withdraw from the hiring process.

### *Domo's Strangling of Big Squid's Workflow*

51.    In March 2018, at the same time it intensified its efforts to misappropriate Big Squid's intellectual property and interfere with its customer relationships, Domo made the overt decision to greatly reduce outsourced services to Big Squid.

52.    Prior to March 2018, Domo had been outsourcing roughly twelve projects per month to Big Squid under the MSPA and the MRRA.  Beginning in March 2018, this outsourced-project

11

rate dropped, with Domo outsourcing a single project in March and continuing at the rate of 0 to 2 projects per month.

53.     Domo made this abrupt change without informing Big Squid that they were purposefully intending to cut off their vital flow of outsourcing projects, which Big Squid had expected and invested significant resources in to accommodate, all in good faith as part of the MPSA and MRRA with Domo.

54.     Again, no written communication was provided that Domo intended to do take these steps to cut off work to Big Squid, and, to the contrary, when Big Squid inquired into Domo's practices, Domo assured Big Squid in writing and orally that they were doing everything they could to send Big Squid more work.

55.     At the same time it was cutting off Big Squid from Domo-referred work, Domo initiated a campaign to keep Big Squid from performing work for any other company, as well.

56.     This campaign came as a great surprise to Big Squid, as during the course of the partnership between Big Squid and Domo, Big Squid sought Domo's support in expanding beyond the Domo platform as a provider of both machine learning software and services.  Big Squid had informed Domo, on many occasions, of its intention to grow its business, which would benefit not only Big Squid but also Domo, as an investor in Big Squid.

57.     On numerous occasions, Domo executives endorsed this strategy, and did not object at any time in writing or verbally.  With Domo's blessing, Big Squid began partnering with other platform providers for software and in one case, outsourced services.  Domo executives continued to support the strategy and never opposed these partnerships for over a year, verbally or in writing.

58.     Unexpectedly, on August 1, 2018, Domo sent Big Squid a letter from their Chief Legal Officer accusing Big Squid of creating improper partnerships along the very lines of what Domo had previously endorsed and supported.  Further, Domo asserted that creating such partnerships

1540276.1

would in their view constitute competitive partnerships, which in their view would violate the MPSA.

59.     Given Domo's longstanding endorsement of Big Squid's strategy to expand beyond Domo and with full knowledge of our efforts, including public disclosures on partner websites and at partner conferences of these partnerships, Big Squid was confused and at a loss for why Domo would suddenly make these assertions.  Further attempts by Big Squid to get clarity on Domo's interests and motivations have been met by a confusing array of responses from Domo, most of which are contradictory and damage Big Squid's ability to operate as a business.

60.     Furthermore, in the August 1st letter from Domo, Domo sought to articulate over 50 competitors that they are demanding Big Squid avoid as partners, even though no such list had ever been presented to Big Squid prior to August 1st, and the list itself is so broad that it is unreasonable to expect any technology vendor to operate successfully in the broader ecosystem without such partnerships.

61.     It is important to note that for the one vendor that Big Squid did provide outsourcing services for, Looker, it was with Domo's endorsement, and that the Big Squid consultant was *not* certified on Domo as required by the Domo MPSA and deliberately was located in a different city and state from Big Squid HQ, with no proximate interactions with Big Squid–Domo consultants, extra measures that Big Squid voluntarily took on at our own cost and effort.

62.     In short, Domo's actions make it clear that the intent of its campaign was not to protect confidential information or to safeguard its goodwill—Domo's intent was to keep Big Squid from obtaining work from any source, with the express goal of crippling Big Squid.

### *Domo's Efforts to Create Leverage for New Partner Agreements*

63.     Domo wanted Big Squid incapacitated because it believed it would increase its negotiating leverage.  In mid-2018, Domo sent Big Squid several drafts of several new agreements,

insisting that Big Squid would not receive any new outsource work until it signed the agreements and that the agreements were not open to negotiation.

64.    Domo also suggested that all other Domo partners had signed these agreements, an assertion that later proved to be false.

65.    As the Big Squid team sought to review the documents, Domo continued to maintain that no outsourcing projects would be sent to Big Squid, a disingenuous position, given that Domo continued to send outsourcing projects to other similarly situated companies who also had not signed the new agreement.

66.    In late July or early August, Domo sent Big Squid yet another agreement that demanded Big Squid sign, only to tell Big Squid weeks later that we should disregard this agreement.

67.    Also in the early August 2018 timeframe, Big Squid, Domo executives, and other company representatives held a well-attended meeting to discuss the parties' partnership and go-forward plan.  During this meeting, several issues were raised by Domo.  Big Squid addressed and explained each of these issues and believed the parties had reached agreement on how to better handle the raised concerns with a go-forward understanding and revised agreements.  Believing the high-rate of employee turnover at Domo was the cause of the misunderstandings, Big Squid thought it had resolved the issues and began preparing for a renewed partnership.  Instead, and beginning the following day, Domo accused Big Squid of misconduct, refused to outsource any further work, and refused to pay outstanding invoices.

68.    Naturally all of this contradictory and outright false information made it extremely challenging for Big Squid to operate its business and have a clear understanding of what actions Domo desired it take.

### Domo's Refusal to Make Payments Under Its Agreements with Big Squid

69.    Beginning in May 2018, Domo abruptly stopped making payments under the agreements with Big Squid described above.  Big Squid has not yet received payment on more than 25

14

invoices sent to Domo, most dated between April 30 and August 31, 2018, with most due dates falling between May 15 and September 15, 2018.

70.   As of November 1, 2018, the total amount due under these invoices exceeds $940,000, with roughly a third attributable to services provided on Domo's behalf, in accordance with the MSPA and/or the MRRA, and the other two-thirds attributable to sales of Big Squid apps through the Domo Appstore, in accordance with the DAPPA.

71.   On October 5, 2018, Big Squid sought adequate assurances from Domo that it intends to abide by its express and implied contractual obligations, beginning with its obligation to make timely payments to Big Squid under the MSPA, DAPPA, and MRRA, and further its obligation to not destroy or injure Big Squid's right to receive the fruits of its contracts with Domo.  Domo responded by stating the request was "strange" and that "[o]f course Domo will continue to abide by the contract"——yet, Domo breached its obligations months before without justification.

72.   Big Squid has communicated directly with Domo regarding payment of these invoices. Domo is aware of its payment obligations to Big Squid and is aware that its payments are past due. Despite this awareness, Domo refuses to make the payments required by its contracts with Big Squid.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Breach of Contract**

73.   Big Squid realleges each of the foregoing allegations as if fully set forth herein.

74.   At least three agreements exist between Big Squid and Domo regarding Domo's obligation to pay Big Squid for services Big Squid has performed and to transmit to Big Squid subscribers payments received by Domo for Big Squid apps listed in the Domo Appstore.  These agreements—the MSPA, the DAPPA, and the MRRA—are described in detail above.  At the time each of these agreements was signed, it constituted a valid and binding contract under the laws of the state of Utah.  And each of these three contracts has governed Domo's obligation to transmit payments to Big Squid for at least some stretch of time over the past several years.

75.   Section 14.13 of the MRRA states that it "constitute[s] the complete and exclusive understanding and agreement between the parties regarding its subject matter and supersedes all prior contemporaneous agreements or understandings, written or oral, relating to its subject matter." Given the subject-matter overlap between the MRRA and the MSPA, the MRRA largely—if not entirely—supplanted the MSPA. Because the subject matter of the DAPPA and its amendment is different that the subject matter of the MRRA, the DAPPA's payment terms and its protections for Big Squid's IP remain in force even after the parties reached agreement on the MRRA.

76.   Domo has breached the covenants and obligations set forth in the MSPA, the DAPPA, and the MRRA by failing to make timely payments to Big Squid under the terms of these agreements.

77.   Domo has also breached the covenants and obligations set forth in the MSPA, the DAPPA, and the MRRA by utilizing, incorporating, and relying upon Big Squid's intellectual property and/or confidential information in developing its own products, including its Mr. Roboto platform.

78.   Big Squid has been and continues to be injured by Domo's breaches. In addition to the loss of the payments themselves and the costs and fees associated with bringing this suit, Big Squid's injuries include lost business opportunities and reputational harm to Big Squid stemming from Domo's breaches, as well as actual losses attributable to the misuse of its intellectual property.

79.   Big Squid is entitled to an award of damages in an amount to be determined at trial, including recovery of the payments owed under the MSPA, the DAPPA, and the MRRA that Domo has refused to make and the actual losses associated with the misuse of its intellectual property, along with the fees and costs associated with bringing this action.

80.   Big Squid has been injured and will continue to be injured because of Domo's breaches. Unless enjoined by the court, Domo will continue to breach its contractual obligations, by using

and/or disclosing Big Squid's confidential information, and will continue to benefit from the unauthorized use of that information, and Big Squid will suffer significant and irreparable harm.

81.    Big Squid's legal remedies cannot adequately address the injury Big Squid has suffered and will continue to suffer as a result of Domo's breaches.  In addition to the damages described above, injunctive relief is also needed to prevent further injury to Big Squid.

**SECOND CLAIM FOR RELIEF**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

82.    Big Squid realleges each of the foregoing allegations as if fully set forth herein.

83.    An implied covenant of good faith and fair dealing inheres in each of the contracts at issue here—the MSPA, the DAPPA, and the MRRA.

84.    That implied covenant prohibits Domo from taking any action that would intentionally destroy or injure Big Squid's right to receive the "fruits" (or "justified expectations") of its contracts with Domo.

85.    Chief among Big Squid's justified expectations under its contracts with Domo was the expectation that it would be paid for the work it performed and for its Appstore offerings, and that payments due to Big Squid would not be withheld to exert competitive pressure on Big Squid, to create leverage for future business negotiations, to damage Big Squid's business relationships, or for any other reason.

86.    By failing to make timely payments to Big Squid, Domo has breached the implied covenant of good faith and fair dealing inherent in the MSPA, the DAPPA, and the MRRA.

87.    Big Squid has been injured by Domo's breaches.  In addition to the loss of the payments themselves and the costs and fees associated with bringing this suit, Big Squid's injuries include lost business opportunities and reputational harm to Big Squid stemming from Domo's breaches.

88.    Big Squid is entitled to an award of damages in an amount to be determined at trial, including recovery of the payments owed under the MSPA, the DAPPA, and the MRRA that Domo has refused to make, along with the fees and costs associated with bringing this action.

1540276.1

## THIRD CLAIM FOR RELIEF
### Tortious Interference with Economic Relations

89.   Big Squid realleges each of the foregoing allegations as if fully set forth herein.

90.   Based on the conduct described herein, Domo has intentionally interfered in existing and/or potential economic relations between Big Squid and its customers and/or partners.

91.   Domo knew or should have known that their actions constituting such interference would interfere with Big Squid's economic relations.

92.   In interfering with Big Squid's economic relations, Domo employed improper means, including but not limited to the misuse of Big Squid's confidential information, deceit and misrepresentation, deliberate breaches of contractual and non-contractual duties with the intent to injure Big Squid, and other acts not in accordance with the established standards of Domo's trade or profession and/or generally accepted business ethics and practices.

93.   Domo's interference is not protected by any privilege.

94.   Big Squid has been injured and will continue to be injured because of Domo's interference and is entitled to recover damages in an amount to be proven at trial. Upon information and belief, Domo's interference with Big Squid's economic relations is willful, malicious, intentionally fraudulent, and/or knowingly and recklessly indifferent toward and in disregard of the rights of others and the consequences thereof.

95.   As a result, Big Squid is entitled to recover punitive and exemplary damages from and against Domo, in an amount a fact-finder deems reasonable, to deter Domo from such wrongful conduct in the future.

96.   Unless enjoined by the court, Domo will continue to intentionally interfere with  Big Squid's existing or potential economic relations, and Big Squid will suffer significant and irreparable harm.

97.   To the extent that Big Squid's legal remedies cannot adequately address the injury Big Squid has suffered and will continue to suffer as a result of Domo's interference, injunctive relief is needed to prevent further injury to Big Squid.

## FOURTH CLAIM FOR RELIEF
### Unfair Competition

98.   Big Squid realleges each of the foregoing allegations as if fully set forth herein.

99.   Domo's conduct alleged herein, including but not limited to Domo's misappropriation and misuse of Big Squid's proprietary information, Domo's misuse of Big Squid's confidential information, its deceit and misrepresentation, and its deliberate breaches of contractual and non-contractual duties with the intent to injure Big Squid constitute unfair competition under Utah common law.

100.   As a direct and proximate result of the foregoing acts, practices, and conduct, Big Squid has been or is likely to suffer substantial injury, including damages to Big Squid's reputation, lost revenues and profits, and diminished goodwill.

101.   Domo's misconduct is willful and constitutes a blatant attempt to injure Big Squid.

102.   To the extent that Big Squid's legal remedies cannot adequately address the injury Big Squid has suffered and will continue to suffer as a result of Domo's unfair competition, injunctive relief is needed to prevent further injury to Big Squid.

103.   Unless enjoined, Domo's conduct will continue to injure Big Squid irreparably. This threat of future injury to Big Squid's reputation and goodwill requires injunctive relief to prevent such infringement and to ameliorate and mitigate Big Squid's injury.

## FIFTH CLAIM FOR RELIEF
### Declaratory Judgment

104.   Big Squid realleges each of the foregoing allegations as if fully set forth herein.

105.   To the extent Domo seeks to enforce Section 6.3 of the MSPA, even after the term of the MSPA has expired or if not replaced and superseded by the MRRA, that section of the MSPA

19

is unenforceable. Restrictive covenants are enforceable only if "carefully drawn to protect only the legitimate interests" of the enforcing party. Given that the MSPA, the DAPPA, and the MRRA have separate provisions protecting Domo's intellectual property, the MSPA's post-relationship restrictive covenant is nothing but a naked restraint on competition, and is thus unenforceable.

106. Given the subject-matter overlap between the MRRA and the MSPA, Section 6.3 of the MSPA is also unenforceable because the MRRA supplanted the MSPA.

107. Furthermore, Domo itself has violated Section 2 of the December 16, 2016 DAPPA Amendment by utilizing, incorporating or relying upon Big Squid's Intellectual Property or Confidential Information in developing, acquiring, licensing, marketing, promoting, or distributing products, software, or technologies that perform the same or similar functions as, or otherwise compete with Big Squid's Apps, products, software, or technologies.

108. The unenforceability of Section 6.3 of the MSPA and Domo's violation of Section 2 of the December 16, 2016 DAPPA amendment constitute substantial and continuing controversies between Big Squid and Domo. A declaration of rights is therefore both necessary and appropriate to establish that Domo's actions are inconsistent with Section 2 of the December 16, 2016 DAPPA and to establish that Section 6.3 of the MSPA is unenforceable.

109. Aside from the financial injuries Big Squid has suffered, Big Squid is also being injured by Domo's actions. These injuries include diminishment of Big Squid's goodwill and the disruption of business relationships.

110. The relief Big Squid requests would redress its injury: a declaratory judgment providing that Domo has violated Section 2 of the December 16, 2016 DAPPA amendment and providing that the Section 6.3 of the MSPA is unenforceable would vindicate Big Squid's right to its intellectual property and would keep Domo from wielding an unenforceable restrictive covenant in an attempt to keep Big Squid from the marketplace.

1540276.1

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Utah Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Big Squid demands entry of judgment in its favor and against Domo as follows:

A.    For an award of Big Squid's actual damages, including but not limited to the approximately $940,000 in past-due payments owed by Domo;

B.    For other consequential damages stemming from Domo's breaches, including damages associated with Big Squid's lost business opportunities and reputational harm;

C.    For an Order declaring that Domo has violated Section 2 of the December 16, 2016 DAPPA amendment and providing that Section 6.3 of the MSPA is unenforceable;

D.    For an award of attorneys' fees and costs incurred by Big Squid; and

E.    For such further relief as the Court deems just and appropriate;

Dated:  January 30, 2019.

JONES WALDO HOLBROOK & McDONOUGH PC

By: _____

Christopher B. Hadley
Nathan D. Thomas
C. Michael Judd

*Attorneys for Plaintiff Big Squid Inc.*

1540276.1

Gregory M. Saylin (9648)
Nicole M. Deforge (7581)
Tyson C. Horrocks (12557)
Sarah C. Vaughn (14615)
**FABIAN VANCOTT**
215 South State Street, Suite 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
gsaylin@fabianvancott.com
ndeforge@fabianvancott.com
thorrocks@fabianvancott.com
svaughn@fabianvancott.com

*Attorney for Defendant Domo, Inc.*

---

### IN THE THIRD DISTRICT COURT, SALT LAKE COUNTY
### STATE OF UTAH

| | |
|---|---|
| BIG SQUID, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>DOMO, INC.,<br><br>        Defendant. | **NOTICE OF REMOVAL TO FEDERAL COURT**<br><br>Civil No. 190900914<br><br>Judge:  Richard Mrazik |

TO THE CLERK OF COURT AND PLAINTIFF'S COUNSEL OF RECORD:

Please take notice that pursuant to 28 U.S.C. § 1446(d), Defendant Domo, Inc. ("Domo")

filed a Notice of Removal removing the above-titled action from this Court to the United States

District Court for the District of Utah.  A copy of the Notice of Removal is attached hereto as

**Exhibit 1**.

DATED this 19th day of February, 2019.

Respectfully submitted,

/s/ *Gregory M. Saylin*
Gregory M. Saylin
Nicole M. Deforge
Tyson C. Horrocks
Sarah C. Vaughn
*Attorneys for Domo, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 19th day of February, 2019, I caused a true and correct copy

of the foregoing **NOTICE OF REMOVAL TO FEDERAL COURT** to be served via the

Court's electronic filing system to counsel of record who have made an appearance in this action.


*/s/ Tyson C. Horrocks*_____